Please be seated. Your Honor, this is the second case of the morning called 2-12-10-13, Board of Education of Durand Community School District No. 322 v. Board of Education of City of Chicago. On behalf of the appellant, Ms. Leigh Ann Lauder. On behalf of the appellee, Ms. Laura M. Sinaras. Okay, good morning everyone. Ms. Lauder. Your Honors, may counsel may please the court. The trial court's award of damages is not supported by the record here. The award of damages at a residential tuition rate. First, none of the children at Maryville resided at Durand. They all resided at Maryville. Second, the Dolan prepared IEPs for each of these students that said they needed day treatment, not a residential placement. Okay, and now is the board paying a separate residential to Maryville? I mean, are they placed at Maryville pursuant to the board's recommendation ultimately? No. So that they have a separate payment just for the housing portion of their life? No, I think the Catholic Church provided for the residential. And it was the parents of these girls who placed them at Maryville, not the board. They were in special ed classes in Chicago public schools and their parents couldn't control them, so they placed them at Maryville. And then Maryville placed them at Durand. Well, they had to go to school somewhere once at Maryville. Absolutely, that's right. But they weren't housed at Dolan. And we were charged as if they were. Counsel, did you raise this specifically in the closing arguments? I mean, is there a waiver or forfeiture issue here? No, Your Honor, I don't believe so. We argued throughout that they were housed at Maryville. They were housed at Maryville. They were not housed at Dolan. I mean, it's pretty simple. I mean, residential means housed and that they were never housed there, and yet we were charged as if they were. Well, why does it mean housing? I'm looking at the structure of this particular system where they have day school attendance and residential school attendance as a way of differentiating. What if they called them, and I'm not suggesting this, higher maintenance IEP? That wouldn't work because that would be certainly inappropriate. So the school district is trying to figure out a name, and they chose residential. Okay. Then maybe what they suggested was that these kids had a higher level of attendance, needed a higher level of attendance. And that was to justify the difference. You're right. That's the bottom line rationale. So Mr. Parent, principal Parent, said he used a common sense approach to decide that they needed to charge more. And he said it should be a common sense 8 to 10 percent. And yet it was actually 4 to 10 times that much. In the last year, they were charging 81 percent higher. And in the first year, 63 percent higher. The second year, 36 percent higher. Where's the rationale in that? Well, were there costs associated with these IEPs that were different from the costs associated with, because everybody, or almost everybody that's in this program is, you know, they're pursuant to an IEP, correct? Even the day program. Right. They're all there. They testified that every child at Dolan was a special ed kid. Okay. So let's look at that. Their documentation. And it's sorely missing. I'm going to show you five holes in their documentation that shows that there is no basis for this charge. The first is the missing data information forms. Now, Miller, who was the business manager at the co-op, testified that teachers and supervisors prepare these data information forms to show what kind of services they're providing to the kids. And those are supposed to be attached to the IEPs. They weren't. Turned over to us. So we don't know, and in fact, well, we do know because Mr. Parent testified that the day school students and the residential students, they attend the exact same classes. They have the same teachers. The second missing set of documents was the personnel reimbursement claim forms. Now, Durant has to submit those to the Illinois State Board of Education every year. But they didn't provide them to us. The third set of missing documents is the missing schedules to Form B. Now, Miller testified that these were very important to the billing process because they had to do with offsetting the personnel cost, the cost of instruction. But they weren't provided to us. Now, Miller said that she'd seen those from other districts, but she'd never seen them from Durant. The fourth category of missing documents is the bills from the co-op. Now, you'd think if these kids required a higher intensity level of services, they might need more psychological help, social work, maybe speech therapy. They didn't attach those bills either. And what was the reason that these documents were not provided? I don't know. We asked for them. We asked for them three years before the hearing. And Durant's counsel said they provided all the documents, but they didn't provide these documents. And I think that you can infer from that that those documents would not have supported their case. And so you're looking for documents from 2005-6, 2006-7, and 2007-8? Right, that's what we asked for. Because the hearing was in April of 2008 or something in that vicinity? Well, the original hearing was, but there was no hearing on damages then. The hearing on damages came after the remand from this court. Was there a new request for documents on the issue of damages then? I don't believe so, but there was no reason to because all of this had happened in the past. The kids were not there anymore. The kids all left at the time that, well, actually, Judge Prochaska entered his order telling Dolan to disclose all their IEPs, health records, progress reports on July 2nd of 2008, and the last Chicago student was discharged the day before. So there was no reason for us to ask for additional documents because they'd all been prepared by then. Counsel, I understand your question or your challenge as to whether or not the record supports the award, the monetary award here, but let me ask you a threshold question. Are you questioning whether the ISBA, ISB rules and regulations, prohibit the district from dividing students in the special education classes into more than one group and then allocating costs among those groups? Are you saying they can't do that or are you simply questioning the computations? Well, Mr. Damon said he didn't know whether the rules allowed that, and I don't think the rules allow a district to charge for residential treatment when they're not providing housing. But you can't point us to any specific rule or regulation that says that. They're prohibited from doing that, can you? Well, I pointed to the statute that says residential means housing. Dolan never reimbursed Maryville for any housing? Dolan? No, I don't believe so. I believe the Catholic Church and the parents paid for that, for the housing component of the placement. Did they send any? Because these students apparently were higher risk, at least that's according to principal parent, did personnel from Dolan occasionally visit the children at Maryville because there was an emergency or because they needed additional services? There was no evidence of that in the record. In fact, let's talk about that higher intensity need for services, because principal parents said they were five times more likely to be hospitalized or placed in juvenile detention. But none of the girls, none of the four Chicago girls was ever placed in detention. Two of the Chicago girls... I thought there were three of them that were hospitalized, two rather significantly, and a third one not as often but still had at least one, maybe two hospitalizations. No, two of the girls were never hospitalized. Those were Amanda and... I apologize, Amanda, and I can't see my notes because it's dark in here. Well, Alexander was and... Alexander and Valerie were, but the other two never were. Well, isn't he sort of an expert witness? I mean, a parent has had 22 years of experience at Dolan. Who better then to testify? I mean, he classifies them as the residential or day. You seem to be saying, well, you know, there's a need. He testifies, too, for more intensive supervisory services for the second group. What you're saying, well, but some of them may not have been hospitalized. Do they have to track everything the individual student does, or can they do it as part of a classification of a group? Do people set tuitions when you go to college based on all individual factors, or what? Well, actually, Mr. Parent said these kids needed day school. He's the one who said on their IEPs that they needed day school placement. So he's the one who has decided which category to put the kids in, right? Right, but he also decided it was a special, a higher level of supervision services that justified the difference in the cost. That was the basic rationale he gave. And he said it was based in part on those behavior sheets that they kept for kids every day. They were likely to be hacked out, et cetera, et cetera. Right. He said that those would have showed, those behavior sheets that were sent home to the parents or the caregivers every day, would show that the kids were banging their heads against the wall or they were cutting themselves or, you know, threatening suicide. Those documents weren't turned over to the board either. So there's no basis in this record to show that these kids or any kids needed that because they didn't turn over those records of the behavior, you know, behavior point sheets either. Where did the IEPs originate? In the city of Chicago, correct? The kids had IEPs when they were in Chicago. Okay. Then their parents unilaterally decided to place them, two of them, in Bartlett in Maryville. When the children, those kids were in Bartlett, they went to the local public school. They didn't go to some special residential placement. Two of the kids were placed directly at Maryville. Those two in Bartlett came over to Dolan because Bartlett closed, not because they needed a higher intensity level of services but because that facility closed. When they came to Dolan, Dolan prepared an IEP for them, and Dolan said they needed day treatment. But the city of Chicago had to be involved, or someone from Chicago had to be involved in that IEP, correct? We were notified of it. We took the position that the parents didn't have the right to unilaterally make that placement. We lost that argument in the first appeal. So nobody attended. Nobody had a voice in the particular IEPs of those four girls. Right. No one from the Chicago public schools attended. Notwithstanding the failure to attend, the servicing school has an obligation to make certain progress reports on an annual, actually it's a semi-annual basis I think, but maybe at this time it wasn't. Did the city of Chicago exercise their right to participate in those, or the Board of Education rather? I apologize, not the city. It's okay. I don't think that the record shows that. I know we weren't at the initial IEP meetings. I know we did receive the progress reports. And the progress reports customarily show hours of service that have occurred, show five or six different goals and the possible attainment of those goals with additional services. Isn't that correct? There was only one IEP for these kids, one IEP that was prepared. So in my experience, the IEP is where the progress report is every six months, but there was only one IEP provided for each of these kids. Even though they were there for four years or three years? Two were there for three years and two were there for one year. Let me ask you something. When the last trial or the last appeal and the court remanded it, the first hearing prior to this court remanding it, was there no evidence taken with respect to the dollar amount, with respect to damages? Before it went to appeal the first time, there was no hearing on damages. And the remand from this court was for a hearing on damages. So, yes, there was a hearing on damages. And it's our contention that the evidence did not support the award of damages at this residential tuition rate. First, I mean, the children went to the same school. They were in the same classes. They had the same teachers. Even though their IEPs called for an individual aid, the parent admitted they didn't have an individual aid. So what was the reason for the $8,000 disparity in the cost there? And then parent testified, well, Dolan testified that parent decided how to allocate the cost. Then parent testified, oh, no, I didn't make the allocation of my salary. So it's like, who made this decision? The record is not clear on that. But we do know that the Chicago and the residential students who didn't reside there were charged way more for the principal's salary, more for even the computers that were used by administrators, three times more for those computers that were used by administrators, and even more for food. There's simply no basis in the record for this disparity. Well, the problem isn't all just Dolan. This is something that is required by the Illinois State Board of Education. If you're going to call people residential or whatever you're going to call them that differentiates them from others, they have a checklist, as it were, don't they, that has to be, I mean, although you may not know in this case, I know the city board must know in other cases. The State Board of Ed sets the outline, the four corners. The school district has to comply. Isn't that correct? I'm sure that the residential, I believe, means housing, yes. But in the day program they have to show how much of the time of an administrator or they have to allocate how much of the time of an administrator is involved. And administration requires supplies. It requires computers. It requires the principal maybe. And in fact, Parent testified that he was involved in re-enrollments and two of the girls had to be re-enrolled, I think, at least once and maybe twice. So the Illinois State Board sets the four corners of this process and the school district fills in the blanks. Isn't that correct? There was nothing that showed what that allocation should have been. Nothing that we could see that showed that we should be charged, you know. The city never sought any ISBE records. We did not seek their records. We sought what Duran submitted to ISBE. But there was nothing prohibiting the board from seeking ISBE records, correct? I don't think the ISBE would have records different from Duran. They get their information about what services are provided from that local district. But those documents could have. Is there anything preventing them from being secured from ISBE by the district who is responsible for the child? No, but I don't think there's anything that we needed from them because I think that Duran should have showed us their personnel reimbursement forms. Those would have showed us what we needed to know, which was which teachers and supervisors were assigned to these residential students. It's obvious the reason they didn't provide this is because there was no difference because they attended the same classes and they had no different aides. Do you think that they were mixing the word residential versus out-of-district? They may be caught charging more because they were out-of-district students versus in-district? If that's the case, then I think this is really a money-making proposition for Duran, right? To sort of soak the out-of-district students. And I don't think that there's a reasonable basis for that. At least there hasn't been one provided by Duran. If the parents didn't feel that their children were being given appropriate education or something in the IEP for the child in special ed wasn't being fulfilled, don't they have the right to seek education and doesn't any board, not just Chicago, but Elgin, Duran, doesn't any board have an obligation until those children are old enough to make sure that their IEPs are being met? Well, in this case the parents said that they couldn't handle the kids and one of the parents actually wasn't even in touch with Maryville. They sent him seven letters and he never responded. So the parents, I can't answer for them. Whether the board had an obligation to be sure that these kids were receiving an adequate education, I don't think that we're saying that they didn't receive an adequate education. We're saying that we were billed way more than we should have been for the services they received. Thank you. Counsel? Good morning. Good morning. Please, the court, counsel. Laura Sennar is here on behalf of Duran School District and I'm here to ask you to uphold the determination of damages awarded by Judge Pachaca after the evidentiary hearing held on the damages due to the Duran School District for educating the four students from Duran. All right. The primary problem, at least as presented in the oral argument, although there are several others identified in the briefing, is missing documents. What's Duran's position on missing or incomplete documents? Sure. There were four types of documents that the defendants have asserted were not appropriately produced through discovery and through the hearing process. I submit to you that the information that they needed was certainly produced in order to determine the appropriateness of the calculations. With regard to Schedules A and B, which all relate to the 5066 A, B, and C forms that you've probably reviewed ad nauseum at this point, that information was provided to the district in multiple formats. Schedule A related to the students' attendance and enrollment, and that information was provided through attendance reports that were submitted through discovery, through enrollment reports that were submitted through discovery. They're hypothesizing as to what they think this information could suggest, but they have produced no witnesses as to what those forms should have produced. They have produced no documentation or evidence as to what they believe those forms even contain. There's no evidence to suggest that. Okay. What was the plaintiff in this case? Who was looking to get paid? The Duran School District. My client. So your client was asked to produce certain documents that ultimately justified the amount of money being requested. And counsel is saying that there were no personnel compensation sheets and how those compensations were divided among what's called residential and what's called day school attendees. The administrative division, the specific administrative division sheet was not provided. Why weren't those provided? I don't know that they exist in the form that counsel is suggesting that they do. Well, why weren't they provided in any form? Well, they were provided. With regard to the personnel reimbursement forms, if you look at Group Exhibit 8, which was one of the hearing exhibits, it has for every single year each employee and the reimbursement awarded by the Illinois State Board of Education for each of those employees for each year that the district was requesting reimbursement. That number was approved and determined appropriate by the Illinois State Board of Education. It's their form. That number was the form that was ultimately concluded in Form 5066A to ultimately determine the offset then to the total cost. Was it a lump form or was it a, as Duran has chosen to call these students, residential and day students, did it show what percentage of that salary went to residential and what percentage salary? It does not. Okay. The forms themselves, what they show is all of the employees that Duran School District 322 sought reimbursement for. There are handwritten notes in that form then that were prepared by Bill Damon that indicate which of those employees were employed by and assigned to the Dolan Center and which were employed by and assigned to other special education services and programs that were operated by District 322. The Dolan Educational Center is not the only special education, the only place where special education services are delivered. So on the forms that were produced both in discovery and then as entered into evidence at the hearing, the personnel costs were certainly determined and calculated and shown as being approved by the Illinois State Board of Education. So are you saying in essence that the information she's asking for has to be provided in some form to the Illinois State Board of Education? It may not be in precisely the manner that you would look for in litigation, but you're saying in essence that information is required to and was provided to the state. Is that what you're saying? It was. And then in response to the information that was submitted to the State Board of Education, they approved certain personnel reimbursements for these individual employees. But there's nothing that's written down. But there's nothing that requires it to be broken down, Your Honor. So there's no requirement. They seem to be, in their arguments, they've come up with all sorts of additional information they would like, additional breakdowns, additional data. But the regulations themselves, the statute itself, the forms themselves don't require that those breakdowns be provided. There is no prohibition in response to your question that would prevent a school district from assigning different costs the way that it was done in this particular case. And with regard to the residential. Explain that. How are they residential if they're living at Maryville? You're not claiming. It's Bill Damon's term. For good or for bad, Mr. Damon had to differentiate or chose to differentiate between the program costs that are associated with those students that were at the Maryville campus and living there and attending the program. That might be a misnomer. It is a misnomer. It was his term of his term. But there was an underlying rational or reason to distinguish it. That's correct. What does that mean? Mr. Parent testified to multiple reasons as to why these students, these residential students, meaning the students who came from Maryville, who lived on the Maryville campus, as compared to the day school students who were not just Duran students. There were some Duran students, but there were students from all over the county who attend the Dolan Center who require that level of intensity. Were there any students bussed from Chicago to Duran? There were no students who were bussed from Chicago to Duran. And I would suggest that the state regulations would prohibit that transportation in excess of an hour. Because a child can't be on a bus for more than an hour unless there's an emergency. So let me just get this straight. A day student could have been charged as much as a residential student if they needed the same services as that residential student. The district could have made that determination and made that arrangement with the sending school district, yes. Ultimately, I don't know whether that was or was not done. What I can tell you is that Bill Damon calculated two different rates, and that calculation was based upon, as Mr. Parent testified, to the additional intensity of needs that were evidenced by these students. The ones living in Maryville? The ones who lived in Maryville. Required generally more intensive services than the day students. Correct, correct. And I would submit to you that one of the allegations of failure to produce documentation relates to the daily behavior sheets. Those were produced to CPS in discovery in February of 2008. It was over 1,000 pages of materials that related to progress reports, incident reports, daily behavior sheets, their IEPs, all of that. It was over 1,200 pages of documents that were produced with that particular piece of discovery that was produced. There were volumes and thousands of pages of documentation that was produced to CPS in response to their request for discovery. And they don't even know what they have, apparently, because they have every one of those daily behavior documents, which shows when they were in attendance, which shows how they performed on those given days, which shows if there was a crisis report, how that crisis team had to respond and what occurred. And, again, those are things that Mr. Parent cites to as to reasons why they have established over this 22-year period of time a difference rate between. I have a question. Are you aware of any case law or anything in the Illinois school code that prevents the school district from classifying them, breaking down this classification? Is there anything that prohibits them from doing that? No, and I would submit to you that there's obviously a very structured statutory scheme, starting with the language in the school code in 7.01, plus the regulations, plus the forms, plus the guidance, that governs what the school district does. And they complied with all of those. And Judge Pershaka was very careful to make that finding in his order. They complied with all of those requirements. And now, at this point in time, CPS is saying, well, that's not good enough. We want you to do more. But the law, the regulations, and ESB's guidance don't mandate that they do more. They mandate that they do exactly what they did, and that's exactly what Judge Pershaka found. If they don't mandate that they do more, regardless of the fact that they don't mandate that they do more, if in a civil proceeding your opponent asks for a breakdown, is there anything precluding the court from ordering so? I would suggest probably not, if the breakdown exists. And they could have sought it through discovery themselves, specifically. They could have sought it through depositions. They didn't even depose all of the witnesses who appeared, who had been off record for many years by the time we finally got to the hearing on evidence. And the judge did allow for additional discovery over our objection at that point in time, before the hearing in April of 2012. So CPS, at this point in time, is taking pot shots at the evidence and documentation that was presented. But the evidence that was presented satisfied Judge Pershaka and his standard. It satisfied, according to him and according to the district's position, it satisfied the legal requirements that are set forth in the statute regulations and guidance documents. And, therefore, that determination should be upheld here before this court. In those 1,200 pages that were submitted in February of 2008, were the ISBE forms actually submitted with any schedules that needed to be submitted, or was it just the approval letters, so to speak? Those 1,200 pages were all student-specific records that I was referring to. It was in February. I believe it was also February and March of 2008. It could have been 2009. I apologize over the course of the years. That all the documentation that was relating to the 5066A, B, and C forms, plus what I'll call the backup, the budget forms, the personnel claims, the evidence of enrollment, all of that was produced at that point in time. So there was a time. Was that in anticipation of the damages hearing because the liability hearing, or what ultimately became the liability hearing by this court's order, was April of 2008, correct? Correct. So I believe it was in 2008, and it was in advance of the hearing on the liability issues. As the parties, which is probably common, got closer to hearing, additional documentation was discovered and was disclosed pursuant to the orders of the court. So at that point in time, I disclosed all of that. They had already received all of the 5066A, B, and C forms, but all of the supporting forms, including all of the exhibits that were introduced at the hearing on damages, were produced to CPS at that point in time. There were no confidentiality issues concerning these records, correct, because the parents would have had to sign documentation allowing it to be shared with providers as well as the CPS. With regard, CPS was as the, they were really the resident district for those students, so they were entitled to records, the information that identified those students as students with disabilities. And by the way, you used the term resident district. They didn't house them, but that's where their parents lived, correct? Correct. And that's the principle that this court reaffirmed in its decision the first time we were here before you. What about the parent that didn't respond to multiple letters from Maryville? Did he or she participate? There is a parent who, well, there was a parent for whom mail was returned. I would assert to you that based upon my knowledge and the knowledge of the evidence of the record that all of the parents were involved with their students while they were there. They did attend IEP meetings. They had phone contacts with the Dolan staff and the Maryville staff. So these parents may no longer have housed the children in their home, but they were not, they were still involved on some level with these students. So the district never said, we can't give you that information because we don't have the parental permission to do so. No, they never cited a confidentiality concern with regard to disclosure of documents to CPS. And with regard to the programming and services that the students did receive, one of the questions the court had asked was whether CPS had been involved in any of those determinations. And on an annual basis, including in October of 2005, from October of 2005 moving forward, they received multiple notices and multiple requests for their participation in the process. But CPS, as counsel has indicated, believed that it was not their responsibility to be responsible for these students and therefore chose not to participate. So their right to now object to the level of service or the services that were provided, I submit, would be waived because they had the right to participate in all those discussions and never did. The children came to you with IEPs from CPS? Each of them had already been identified, correct. Do you know, I mean, does the record reflect that those IEPs are very similar to the IEPs in Duran or are there significant differences? They vary, they vary as to the level of service that they were receiving and the kinds of services they were receiving. While at Duran they did receive more intensive services than they were receiving at CPS, maybe not to a student but several of them, I would say. But again, that was a determination that was made by that IEP team, working with the parent and the student and making a determination as to what level of need those students had. And CPS chose not to participate in any of those discussions. If you were to select a label for the students at Maryville other than the label that Mr. Parent selected, how would you categorize them? I think I'd probably call them intensive. You know, maybe I would give that the term because that is indeed the rationale for the additional services. Now, were there day students that you would categorize as intensive? I don't know the answer to that. I don't know if the district did that or not. I think the law certainly would allow them to have done that and identify an intensive level of service and need and therefore additional costs associated with that student. I can't assert to you one way or the other whether that occurred. So my question to your opponent was, it sounds to me as though, were they associating Mr. Parent, associating residential with a non-resident in the county? Okay. The answer to that is no. There were many day students who were county students or who were bused in who were outside of Duran School District. And so those students, I assume, although as I said, I did not ask the question, paid the day student rate. I don't know if any of those students paid an increased rate and paid the residential rate. I don't know the answer to that. And you don't know because in this litigation that information would be confidential, correct? I would suggest yes because those would not be CPS students and therefore that information would not be disclosed. So they can't really, I mean, we can't really. Judge Prochaska couldn't really get a bead on, let's say, a student in the day program who has similar problems to Valerie who we know is a residential program. But we can't access the day program student because of confidentiality issues. Correct. Because she or he may be a Rockford District. Or even could be another Duran student. Another Duran student. Or Winnebago. It could be from a variety of counties or communities. How many school districts- But those questions weren't asked either. Well, I think I know why. But how many school districts participate in the Duran program to your knowledge? I don't know the answer to that. I know throughout the county they do, but I don't know how many different school districts are represented. Okay. Well, wouldn't you submit that if that question were asked, the judge could have reviewed it with camera? Oh, sure. Or there could have been a request through discovery, and then that would have been an issue that would have gone before the court. But that was why I made the point. We never got to the point of whether there was a concern over confidentiality and whether certain records or information could be shared because it was never asked. It wasn't asked in documentation, nor was it pursued in the depositions of Bill Damon or Mark Parent, the two individuals they did depose. If you would summarize your remarks or your request. The district, again, would like to ask for the court to uphold the award of $256,265 as it is reasonably related to the cost that Duran incurred in educating these four students from Chicago Public Schools. If you look at the case line again, you've already read the briefs. But if you look at not only do they sustain the damages, but we have established a reasonable basis for those damages. Both through the forms, the law, the statute, and then the testimony. And that's the last piece that I want to leave you with. The courts are very clear that not all evidence supporting damages is going to be documentary evidence and that the court can and should rely upon opinions as long as they are well-based in the law. And I submit to you that those opinions submitted by Mark Parent certainly were well-based in the law, excuse me, in fact and experience. He cited specific reasons as to why these particular students who were categorized as residential students have higher need. And he cited several examples of the basis and rationale for the evidence that supports the higher need. And I submit to you there was no contradictory evidence. There was no challenge to that. There was no other opinion that was offered to the court that would suggest in any way that Mr. Parent's testimony and experience was not 100% true and accurate. That's a final question. This is a mundane matter not touched on yet by you or opposing counsel. But didn't the Board of Education get a little bit of a windfall here? I think the damages that were actually awarded by the judge were $6,000 less than the amount billed. Wasn't there some computation error? There were different computation errors. And so at this point in time, though, the court, we are just asking that the award that was ordered by Judge Breschaka be assessed. It was actually $6,000 or so less than what was actually billed, right? Yes. And I would also submit to you we're now here in 2013 for students who attended this program in 2005. So the district has already incurred considerable costs in waiting for reimbursement for this money from CPS. Thank you. Thank you. Ms. Louder, if you have a response, you may. I just have two brief remarks. First, we know about the difference in the behavior of the two groups, the day and the residential students, because Principal Parent testified that he put the bottom 30 percent of the kids in ESY extended school year, and he said that there were day students in extended school year. So if these were the highest and worst students, why were there also day students with them? Well, don't we have a problem here, though, in that even if, well, what we have is a breakdown of 25 residential students. Four of those students belong to CPS for purposes of this discussion. And we don't even know where those other 21 reside. Right. They might be from the county. They might be from Rockford being bussed in. We know they're not bussed in from Chicago because Chicago to Durand is just too far under the rules. So you never sought any sort of review of those other 21 and then the rest of the day students, correct? No, we didn't. We wouldn't have been entitled to that because they're not our students. Well, but you're trying to say that you're paying too much, but we don't know what services these other 21 versus the how many others? I can't remember how many day students there were. By here it changed. Right. So how can we say that the facts that we have in this record are incomplete and a negative inference should be drawn from the fact that you don't have the breakdown you're looking for? Okay. Well, that's the second point I'd like to address. Now, in the appellee's brief, they didn't say where any of these documents were. I'd like you to note, and that's because the documents are not there. Mr. Damon testified that he sent those personnel reimbursement forms to ISBE, and they tried to admit Exhibit 8. And Exhibit 8, he testified, were not the forms he sent to ISBE. They were the forms that came back from ISBE. So Damon testified that himself. Damon also testified that he didn't submit the co-op bills. The co-op bills were not given to us. The third category was parent testified that he gave the behavior sheets, point sheets, to his counsel. I did the index to the record on appeal here. They were not in there. And parent testified he gave them to counsel. Counsel did not give them to us. The fourth category of documents, those data information sheets, they tried to, at the hearing, submit those as their group Exhibit 6. And the court denied that because they had not submitted them to us in discovery. So it's simply not true that these documents were submitted to us. Let me ask you the question I've been thinking about. Obviously, the underlying rationale, whether we call these students residential students or intensive services students, regardless of the label, the underlying rationale for the difference in the billing was parents' testimony based on 22 years. And in general, the students of Maryville required more overall intensive services and were more time-consuming for the staff to deal with. Did the Chicago Board of Education ever challenge that fundamental underlying rationale? Yes, we challenged it by saying that there was, you know, parents... Are you saying that his testimony based on his experience that the students of Maryville generally required more intensive services, did you dispute that and bring forth evidence at the hearing that was not true? It wasn't our burden to present evidence on damages. No, it isn't, but you could certainly contradict the testimony of your opponent, couldn't you? We didn't need to contradict it. They contradicted it themselves, Your Honor. Damon testified. Damon pointed to parent. Parent pointed to Damon. Damon said that parent's the one who allocated the cost. You know, parent said, no, I didn't allocate the cost. I don't think we needed to come forward with evidence when they couldn't get their story straight themselves. But parent determined who was residential and who was day. That's right. Which makes a huge piece of this equation, correct? Right. And when it comes down to it, parent said these kids, in their IEPs, it says day. They needed a day school. So that's what parent said based upon their behavior sheets that they didn't give us. So I don't think. They're not in their IEPs that have the incident reports. Those are not what you consider the point sheets? No. He said that they sent a point sheet home every day with the kids to their, if you were a kid who lived at home, your parents got it. If you were a kid in a residential facility, the caregiver got it. Those are not in the record. Well, did you ever ask for them from Maryville? Because if they went home with the children, Maryville should have them. I think we did discovery to Maryville, but I don't think that we had to. We're not suing Maryville. We're suing Grant. But you want the point sheets, wherever you can get them from, correct? We did not get the point sheets. Thank you. Thank you. All right. Thank you, counsel, for your arguments. We will take the matter under advisement and we will make a decision in due course. We are going to stand in recess for our next case and be back shortly. Thank you.